724 F.Supp. 993 (1989)
Domingo P. QUIBAN, Plaintiff,
v.
UNITED STATES VETERANS ADMINISTRATION, Defendant.
Civ. A. No. 86-2155.
United States District Court, District of Columbia.
July 11, 1989.
As Corrected July 20, 1989.
*994 Domingo P. Quiban, Quezon City, pro se.
Kenneth Steven Kaufman, Beveridge & Diamond, P.C., Washington, D.C., for plaintiff.
Daniel J. Standish, U.S. Attys. Office, Washington, D.C., for defendant.

MEMORANDUM
AUBREY E. ROBINSON, Jr., Chief Judge.
On June 30, 1989, the government moved for reconsideration of Quiban v. Veterans' Administration, 713 F.Supp. 436 (D.D.C. 1989), and sought to vacate the summary judgments that had been granted in that case and in all other Filipino cases relying on Quiban. In addition, because the government needs to file its notice of appeal on or before July 11, it moved to expedite consideration of its motion for reconsideration. The motion to expedite was granted on July 3, 1989, and the motion for reconsideration therefore has been fully briefed.
The principal thrust of the motion for reconsideration is that because the Court did not exclude matters outside the pleadings it was required to inform the government that it was treating the motion to dismiss as a motion for summary judgment and contemplating entering summary judgment for plaintiff; had it done so, the government would have submitted additional evidence, which either would establish the constitutionality of 38 U.S.C.A. § 107(a) or at least raise a genuine issue of material fact. Therefore, it requests that the order be vacated and the matter be set for cross-motions for summary judgment.
The government's claim that it was unfairly surprised is without merit. But given the importance of the issue involved, the Court has considered the materials submitted by the government. The new evidence does not sustain the constitutionality of § 107(a) or raise an issue of material fact. Therefore, the motion for reconsideration has been denied.[1]

BACKGROUND:
Plaintiff is seeking survivors' benefits based on her husband's non-service-connected death. Section 107(a) precludes the Veterans' Administration from awarding such benefits. After the District Court dismissed her complaint on the basis of 38 U.S.C. § 211(a), which precludes judicial review of determinations made by the Veterans' Administration, the Court of Appeals remanded the case for "the district court to consider the constitutionality of § 211(a)'s [sic] exclusion of Philippine Army veterans from veterans' benefits for non-service-connected disabilities." Quiban v. Veterans Administration, No. 86-5685 slip op. at 1 (D.C.Cir. July 24, 1987) [826 F.2d 129 (table)].
Following remand, the government moved to dismiss for failure to state a *995 claim upon which relief could be granted, arguing that § 107(a) was constitutional. No exhibits were appended to the motion. The Court appointed Beveridge & Diamond to brief the issue on plaintiff's behalf.[2] In their Opposition brief, Beveridge & Diamond included copies of a U.S. Army Study and a Veterans' Administration interpretation of § 107 explaining that the statute does not apply to Old Philippine Scouts. The Opposition Brief also noted Beveridge & Diamond's belief that the matter was ripe for summary judgment, but because they were appearing only as amicus curiae they could not move for summary judgment on Plaintiff's behalf. Amicus Curiae's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss at 2 n. 3 ("Amicus considers plaintiff's case ripe for summary judgment, but due to the non-representational nature of its appearance in this matter, has refrained from filing such a motion and has instead limited its arguments to opposing the VA's motion to dismiss. The Court may, of course, grant summary judgment sua sponte. See, e.g., Kennedy v. Whitehurst, 509 F.Supp. 226, 232 (D.D.C.1981) (when controlling legal issues have been fully briefed and no genuine issues of material fact remain, court may enter summary judgment sua sponte)", aff'd, 690 F.2d 951 (D.C.Cir.1982)).
The government, in its Reply, did not object to the inclusion of such extraneous matters; indeed it relied on upon the very same U.S. Army Study that amicus, now plaintiff's counsel, submitted. Defendant's Reply to Memorandum of Amicus Curiae at 2-3. Moreover, it filed exhibits of its own, namely a copy of a Senate Report and a portion of recorded hearings held on a bill to provide for benefits to New Philippine Scouts ("Hearings"). Beveridge & Diamond, without objection from the government, was allowed to file a SurReply Brief, which included a fuller version of the Hearings submitted by the government. Almost four months after Beveridge & Diamond filed their SurReply, the Court heard oral argument on the motion to dismiss. At the hearing both sides referred to the legislative history and the U.S. Army Study.[3]
The Court then held § 107(a) unconstitutional, and accordingly denied the motion to dismiss. Because the constitutionality of the statute was dispositive as to Plaintiff's claims for declaratory and injunctive relief, the Court sua sponte granted summary judgment for plaintiff on these claims, and remanded the complaint back to the Veterans' Administration to consider plaintiff's claim for survivors' benefits free from the exclusions imposed by § 107(a).
Seven weeks after the Court declared § 107(a) unconstitutional, the Government filed the instant motion, which as noted above, argues that it did not submit evidence of the statute's constitutionality because it did not know that the Court was contemplating entering summary judgment for plaintiff. Briefing and consideration of the motion has been expedited so that the Court can decide it before the government files its notice of appeal, which must be filed by July 11, 1989.

DISCUSSION:
Rule 12(b) provides:
If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given a reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
F.R.C.P. 12(b). There is no question that the Court considered and did not exclude matters outside the pleadings. Therefore *996 it was required to treat it as one for summary judgment, and give all parties a "reasonable opportunity to present all material made pertinent" to a summary judgment motion.
The Court obviously treated the motion as one for summary judgment; it considered extra-pleading matter and granted summary judgment for plaintiff.[4] Thus the key is whether Defendant had a "reasonable opportunity" to present all pertinent material. This turns on whether it knew failure to present such material could result in judgment against it. Under the circumstances of this case, there can be little doubt that the government can and should be charged with such knowledge.
The remand was for the specific purpose to litigate the constitutionality of § 107, which indisputably was the dispositive issue. Defendant could only prevail if the statute was constitutional; plaintiff could only prevail if it was not. Similarly, once the issue was determined there was nothing left to litigate: a determination of constitutionality would have inevitably led to dismissal of the complaint and judgment for defendant; a determination that the statute was unconstitutional could lead to no other result than a declaration to that effect and an injunction against application of the statute.[5] The Court having been directed to consider the constitutionality of § 107(a), and the government having moved to dismiss on the grounds that § 107(a) was constitutional, it is hard to see how the government could not realize the inevitable consequences of a determination that the statute was not constitutional.
Although the government may have initially believed that the constitutional issue could be decided without reference to materials outside the pleadings, it was put on notice at the outset that extra-pleading materials would be considered; exhibits were appended to amicus curiae's opposition. When confronted with the exhibits, defendant did not move to strike as inappropriate; it addressed them, relied on them, and *997 submitted extrinsic material in rebuttal. Defendant having addressed, relied upon, and submitted extrinsic material  in effect treating its motion to dismiss as a motion for summary judgment  cannot be said to have been denied a "reasonable opportunity to present all" pertinent material. See Hollis v. Department of Army, 856 F.2d 1541, 1544 (D.C.Cir.1988); Wheeler v. Hurdman, 825 F.2d 257, 259-60 (10th Cir.), cert. denied, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987); Nichols v. United States, 796 F.2d 361, 364 (10th Cir.1986); Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 392-93 (6th Cir.1975); Cockrum v. Califano, 475 F.Supp. 1222, 1226 (D.D.C.1978).
The government does not dispute the proposition that when, in the course of proceedings on a motion denominated as a motion to dismiss, both parties address and submit extrinsic materials there is no need for the Court to give formal notice that it is treating the motion as one for summary judgment. See Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Reconsideration, at 2 n. 1. Instead, it contends that it did not submit extrinsic factual evidence and its references to Plaintiff's extrinsic evidence, the U.S. Army Report, are not enough to show that it relied on extrinsic evidence. The government's arguments are not persuasive.
As for its contention that it did not submit extrinsic factual evidence, the government emphasizes that the only materials it submitted were legislative history materials (a Senate Report and portions of Hearings). Reply at 2. And then argues that a "statute's legislative history constitutes legal authority for use in statutory construction. It does not constitute factual evidence." Id. (citing U.S. Football League v. National Football League, 842 F.2d 1335, 1374 (2d Cir.1988)) (hereafter USFL). That legislative history constitutes legal authority for use in statutory construction does not mean it does not also constitute factual evidence; and the case relied upon by the government does not purport to decide otherwise, and it certainly does not purport to decide whether it is matter outside the pleadings sufficient to require the Court to convert a motion to dismiss to a motion for summary judgment.
In USFL, the United States Football League had sought to introduce at trial a copy of a House Committee Report to show that the NFL misled Congress by promising to put NFL telecasts up for competitive bidding. The district court excluded it. See 842 F.2d at 1374. The court of appeals held that the district court "properly held that the interpretation of legislative history was not an issue of fact for the jury, see Stissi v. Interstate & Ocean Transp. Co., 765 F.2d 370, 374 (2d Cir.1985), and that such evidence was otherwise excludable under Fed.R.Evid. 403 as overly prejudicial and confusing." 842 F.2d at 1374 (emphasis added).
It is hard to see how the first clause supports the government, for as its citation to Stissi and the ruling below indicate,[6] it appears to state nothing more than the accepted proposition that statutory construction is a question of law for the court. Indeed, read in context,[7] it appears merely to state that the issue of congressional intent is a question of law.[8] This, however, *998 says nothing about the status of the materials used to ascertain legislative intent; i.e., whether they constitute matters outside the pleadings which if considered require the court to treat a motion to dismiss as a motion for summary judgment. The clause only goes to which body is entitled to pass judgment on them  the court or jury.
Legislative history's status as "legal authority for use in statutory construction" does not, by itself, prevent it from also being matter outside the pleading, particularly when it is not used as an aid for statutory construction. Cf. Daly v. Pederson, 278 F.Supp. 88 (D.Minn.1967) (certified copy of court order and memorandum introduced by defendant at hearing on motion to dismiss, leading court to convert it to motion for summary judgment). What should be all-important is how they are used.
The second clause of the quoted statement from USFL directly contradicts the government's position; it analyzes the admissibility of the report as a question of evidence. Thus it supports the proposition that legislative history, when not being offered to aid in the construction of a statute, can be evidence of factual matters covered by the legislative history.
The legislative history offered by the government in support of its motion to dismiss was not offered to help the Court to construe § 107(a); the statute is self-explanatory. Indeed the Senate Report cannot even be considered legislative history of § 107(a); it was the report related to enactment of the Philippines Independence Act, which was enacted twelve years before passage of § 107(a). The Hearings also were not the Hearings that preceded enactment of § 107(a), but instead were what preceded enactment of § 107(b).[9] The materials were offered to show the factual considerations underlying enactment. The Senate Report was offered, presumably, to show that the always-intended independence of the Philippines was a basis for not treating Philippine Army veterans as U.S. Army veterans. The Hearings were apparently offered to show that the different rates of pay and different method of induction justified the disparate treatment.
When legislative history materials are offered to show the factual justification for legislation, as opposed to being an aid to statutory construction or congressional intent, there is no reason why they cannot or should not be considered materials outside the pleadings, which if considered by the court are sufficient to require it to convert the motion to one for summary judgment. In particular and for example, the different rates of pay were relied upon both by Congress and the government in its motion to dismiss to distinguish Philippine Army veterans from U.S. Army veterans. It would have been improper for the Court to grant judgment for defendant based on the fact that different rates of pay justified different benefit levels without allowing Plaintiff to controvert that fact. Indeed, the legislative history of § 107(a) and the U.S. Army Study establish that the rates of pay for Philippine Army veterans were the same as other veterans entitled to full benefits (Old Philippine Scouts)  a fact defendant does not contest. Thus, in light of how it was used, the legislative history quoted and relied upon by the government to establish that different rates of pay formed the rational basis for § 107(a) constituted extra-pleading material within the meaning of Rule 12(b).
Wholly apart from whether the legislative history materials constituted extra-pleading materials within the meaning of Rule 12(b), the record establishes that the government relied upon extrinsic evidentiary materials and thus treated its motion as one for summary judgment. The government's reliance on the U.S. Army Study, ("the Study") by itself, was sufficient to *999 convert the motion. Its effort to downplay its reliance on the Study, which had initially been submitted by plaintiff, is particularly unpersuasive.
The government argues that its use of the Study was insufficient to show it treated the motion as one for summary judgment because it "referred to it only once in its papers, see Defendant's Reply to Memorandum of Amicus Curiae at 2-3 [Factual Background Section], but actually relied on the legislative history for its arguments. See id. at 10-16 [Argument Section]." Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Reconsideration, at 3 (emphasis in original). The government's argument is without merit.
Regardless of how many times it referred to the Study,[10] the government ignores the role it played. The Study was used as support in the Factual Background section of its memorandum to establish the alleged differences in the terms and conditions of service for Philippine Army veterans.[11] The purported differences in "time, terms, and conditions of service" were the basis for the government's argument that the rational basis test should be applied; indeed, it insisted that the classification made by the statute was on the basis of the "time, terms, and conditions of service." Moreover, these differences also established, according to the government, that the rational basis test was satisfied. The absence of a citation to the Study in the argument section of the brief hardly detracts from the reliance the government placed on it; it provided the primary evidentiary support for this argument.
Finally, the government's statement that it did not rely on the Study for its argument ignores what occurred during oral argument. At oral argument the government referred to the Study, again in support of its position that the differences in time, terms, and conditions of service justified the disparate treatment. Indeed, after opening its argument with a detailed description of the different military units operating in the Philippines, which the government noted was established by the U.S. Army Study,[12] the government noted that the differences among the military units went to the "heart" of its argument.[13] Moreover, the government referred the Court to the Study to establish that the Philippine Army was merely a light infantry division with light artillery, and that this difference also justified the disparate treatment, an argument made for the first time at oral argument.[14] There can be no doubt that Defendant, as much as Plaintiff, sought to use the Study to establish its case. When parties arguing a motion to dismiss freely argue and allude to extrinsic evidence, that evidence is properly before the Court. See C. Wright & A. Miller, 5 Federal Practice & Procedure: Civil § 1364, p. 672 & n. 39. Asking the Court to consider extrinsic evidence is equivalent to asking the Court to treat the motion as one for summary judgment.
The overwhelming weight of authority provides that when considering a motion for summary judgment (here defendant's converted motion to dismiss), the court may grant summary judgment to the non-moving party notwithstanding the absence of a cross-motion, so long as the *1000 moving party can be charged with knowledge that it must come forward with its evidence and summary judgment is otherwise appropriate. See C. Wright, A. Miller & M. Kane, 10A Federal Practice & Procedure: Civil § 2720 (2d ed. 1983). As the above analysis indicates, defendant can be charged with knowledge that it had to come forward with its evidence. The government sought to defend the constitutionality of the act; it did so by inviting the Court to consider extrinsic evidence. Since this was the only issue left to be litigated, and a finding of unconstitutionality inexorably led to judgment for plaintiff, Defendant had to be aware that it should come forward with all its evidence. This is not like the cases cited by the Government where the court grants summary judgment on an issue which the party did not know would be the basis for decision, or on an issue the party did not have an opportunity to present evidence on because of time constraints or lack of discovery.[15] And of course, once the Court determined there was no rational basis for the statute, no genuine issues of material fact remained and plaintiff was entitled to judgment as a matter of law. Thus summary judgment for plaintiff was proper.
In sum, the government knew that the Court would consider extrinsic evidence and treat the motion as one for summary judgment. Because it was well aware of the issue to be litigated, the inevitable consequences of the Court's ruling on that issue, and that the Court would consider extrinsic evidence, it had a reasonable opportunity to present all pertinent material. Therefore it cannot claim prejudice because the Court did not formally convert the motion. And in ruling on the defendant's converted motion for summary judgment, it was proper to grant summary judgment for the non-moving party, plaintiff, because defendant should be charged with knowledge that it had to come forward with all its evidence on the constitutionality of § 107(a) and summary judgment was otherwise proper.
Nevertheless, the Court will consider the additional evidence. The Court does not strike down statutes lightly; such an act should only be done on a complete record. Although the government can be charged with the knowledge that it should have come forward with all its evidence, that it did not might indicate that it did not have actual knowledge. Although litigants often must suffer the consequences of miscalculation, given the issue involved the Court will relieve the government of its failure to present the evidence in a timely manner. Thus the Court will review the new evidence.
*1001 Before reviewing the new evidence, however, the Court deems it important to note that the constitutionality of a statute is plainly a question of law. Indeed, it is somewhat unclear what material issue of fact the government contends is raised by the evidence. In its initial memorandum, it apparently contends that congressional intent is the issue of fact. In its reply, it apparently contends that the issue of fact is what were the concerns that motivated Congress, which is nothing more than another formulation of the congressional intent inquiry. But surely the government does not contend that these are issues of fact to be tried; they are issues of law for the Court. See USFL, 842 F.2d at 1374 (interpretation of legislative history a question of law for the Court).[16]
The Court also wishes to make two general points about the evidence before analyzing it in detail. First, the new evidence consists of internal executive memoranda, drafted after passage of § 107 pursuant to President Truman's direction to the VA and War Department to analyze what could be done to solve the "practical difficulties" of administering full benefits in the Philippines. Although the government contends that this evidence is highly relevant to the issue of congressional intent, it cites no authority for the proposition that executive materials prepared after passage of an Act are probative of what motivated Congress to pass the Act in the first place.[17] It certainly points to no evidence indicating that Congress was aware of the specific "practical difficulties." Nevertheless, since Congress did mention "practical difficulties," the Court will give defendant the benefit of the doubt and presume that Congress was aware of the specific practical difficulties discussed by the Executive Departments.
Second, most of the evidence relates to the practical difficulties in administering veterans' benefits not at issue in this case; the Court cannot lose sight of the fact that Plaintiff is seeking survivors' benefits, not hospital care or educational loans. Of course, since the Court's holding applied to all veterans' benefits the Court will discuss the evidence relating to the practical difficulties of administering all programs.
The new evidence is categorized as showing three general reasons motivating Congress to deny full benefits to Philippine Army veterans: first, administrative concerns, also known as "practical difficulties"; second, the pendency of legislation for other aid to the Philippines and the affordability of both other aid and full benefits; third, the imminent Philippine independence. These factors will be discussed in turn.
The new evidence explains the "practical difficulties" to consist of the following: the limited number of hospitals and inadequate staffing necessary for hospital care; inadequate service and medical records; the incompatibility between the broad scale provision of loan and educational assistance and the Philippine economy and limited governmental infrastructure; the inability to administer benefits for such a large number soldiers out of its single office in Manila; the unreliability of the Philippine government to administer benefits fairly.
The evidence as to the limited number of hospitals and inadequate staffing necessary for hospital care is insufficient *1002 to cause the Court to reconsider for several reasons. First, it is the type of "practical difficulty" that boils down to cost, and thus is the type of practical difficulty the Court considered and rejected in its initial opinion; building more hospitals and training more doctors and nurses would alleviate this difficulty. Second, this factor is unrelated to whether Philippine Army veterans are United States Army veterans, and thus there is no rational relation between this factor and the classification made by § 107(a). Third, even if it provides a rational basis  but the Court holds it does not  it is irrelevant to the benefit at issue in this case. That the government could not provide full scale hospitalization benefits is not related to whether it could provide survivors' benefits.
The inadequacy of service and medical records likewise is insufficient to sustain the constitutionality of § 107. First, the government cannot place the entire burden of inadequate records on the individual veterans. The United States inducted Philippine Army soldiers and assumed responsibility for their pay; the government must assume ultimate responsibility for maintaining records. That the government relied, to a certain extent, on the records of an inefficient entity (the Philippine Commonwealth) cannot be used against the veteran to deny them benefits. At best, this only goes to what type of proof an individual must present to establish his prior service.
Second, it is clear that this did not motivate Congress to draw the line that it did; it cannot plausibly be argued that Congress limited benefits to offset the costs of individualized determinations of service.[18] The inadequacy of service records was most acute for identifying guerrillas; the inadequacy of medical records was most acute for identifying service-connected disabilities. See Motion for Reconsideration at Exhibit 1 at 5-6 (Interim Report of Administrator of Veterans Affairs); id. at Exhibit 3 at 5-6 (letter from General Bradley to President Truman); id. at Exhibit 4 at 2 (memorandum from Assistant Administrator for Legislation, G.H. Birdsall, to Administrator of Veterans Affairs). But the government designed a method for determining guerilla service, the establishment of recognized "guerilla rosters";[19] and Congress awarded benefits for service-connected death and disabilities. Since Congress concluded that the most troublesome aspects of inadequate record keeping were no barrier to awarding benefits, it is illogical *1003 to presume that record-keeping concerns motivated the limitation of other benefits.
The government's contention that broad provision of educational loans and employment benefits was incompatible with the Philippine economy and limited governmental infrastructure is not persuasively established by the evidence. The government points to a letter from Harry S. Truman to Omar N. Bradley, Administrator of Veterans' Affairs and a memorandum to file signed by members of the Office of Legislation, VA. Government's Motion for Reconsideration at 9 (citing exhibits 2 and 5). The letter from President Truman says nothing of the sort; it only points out that much of the discrimination would be removed if a practical method of providing educational and employment benefits were created, with the apparent assumption that such a method could be created. The second exhibit, the memorandum to file, states that General Bradley thought that provision for such benefits was "entirely infeasible but that consideration might be given to the authorization, to a limited extent, of education at established schools and possibly some apprenticeship courses." It goes on, in the next paragraph, to state that a Mr. Ely, who was Chief, Division of Philippine Affairs, Department of State, "expressed the view that loan and educational benefits for Filipinos would be `unrealistic' and was of the opinion that the `best we can get out of Congress' is legislation similar to S. 2235." These statements appear to reflect judgments as to the political realities of getting benefit legislation through Congress; there is nothing as to whether the Philippine economy and infrastructure could accommodate such benefits.
Thus the evidence does not establish that these type benefits were denied because the Philippine economy and infrastructure were "ill-suited" for these benefits. Moreover, Ms. Quiban is not seeking educational or loan benefits; she is seeking survivors' benefits.
The VA's concern that it could not administer benefits to such a large number of veterans out of its single office in Manila is directly controlled by the Court's prior determination that the "practical difficulties" rationale was simply a "code-word" for additional expense. No impediment, other than cost and will, appears to have prevented the VA from expanding its offices.
The distrust of the Philippine government's ability and willingness to administer benefit programs fairly as a basis for the statute is frivolous. The obvious solution was to not give the Philippine government control over administration. This concern is equally applicable to benefit programs Congress did enact; it clearly does not sustain the limitations established by § 107(a).
As for the second category of new evidence, that which establishes that Congress considered the veterans' benefits issue in conjunction with the other aid programs it was considering for the Philippines, it adds little or nothing to what was before the Court initially. The Court has already held that the availability of other aid was not sufficient to sustain the exclusions imposed by § 107(a); the Court was made aware of the linkage between the other aid and § 107(a), but rejected it as establishing a rational basis. There is no need to comment on the new evidence further.
As for the third category of new evidence, that which establishes that some viewed the impending independence of the Philippines as significant, it also does not supply a rational basis for § 107(a). First, it has nothing to do with the status of Philippine Army veterans as United States Armed Forces veterans; other foreign nationals, including the Old Philippine Scouts, do not have their benefits limited simply because their service with the United States Armed Forces can be viewed also as service for their countries. Second, that the new Philippine Government could be expected to provide for veterans' benefits for these veterans  even though at the time it was recognized that they were unable to do so on a large scale[20]  is irrelevant *1004 to their eligibility for Veterans' benefits in general and for survivors' benefits in particular. If Philippine Army veterans received Philippine veterans' benefits, the receipt of such benefits would only go to their need for U.S. Veterans' benefits and the amount of benefits to be awarded, not their eligibility for benefits, which as the Court previously noted is determined solely by status. For example, Ms. Quiban's entitlement to survivors' benefits can be adjusted by her income and total wealth. See Quiban v. Veterans Administration, 713 F.Supp. 436, 448 n. 38 (D.D.C.1989) (citing 38 U.S.C. § 541). Thus assuming she received benefits from the Philippine government, those benefits would be included as income and her survivors' benefits would be determined accordingly.
In addition to the three categories of evidence described above, the government makes a couple of other arguments purporting to go to why Philippine Army veterans were not accorded U.S. Army veteran status. It argues that, in contrast to the Old Philippine Scouts, Philippine Army veterans did not join our Armed Forces directly, but instead were inducted pursuant to the President's Order. The Court has already determined that the method of induction is irrelevant to status.
Similarly, the government notes that certain congressmen were of the opinion that the Philippine Army was only "with the United States Army" and not a part of the United States Army. This same opinion had been expressed in the legislative history that had been considered by the Court. The Court now makes explicit what was implicit in the prior Memorandum: this was a distinction without a difference.
The government also asserts that Old Philippine Scouts could be required to serve with the U.S. Army anywhere. But it neglects to mention that the President's Order placed no geographic limitation, and Philippine Army soldiers also could be required to serve anywhere.
Further, the government asserts that Old Philippine Scouts were "trained directly by the U.S. government and hence more valuable to the U.S. government." The government having inducted the Philippine Army into service with knowledge of their training, and having assumed authority to deploy them on the battlefield, can hardly be said to complain that they received an inferior product. In any event, the government proffers no documentary evidence that veterans' benefits were allocated on the basis of "value"; this is particularly significant because the Court noted in its opinion that there was no evidence that Congress deemed the level of training received significant when awarding benefits. Quiban, 713 F.Supp. at 444 n. 25.
Finally, the government once again argues that the cost of extending full benefits to Philippine Army veterans provides the rational basis. The Court has already considered and rejected this argument. No one doubts that reducing costs is a worthy legislative goal. But the means for achieving that goal must be based on a classification having a rational relationship to the statute's purposes. Congress, by singling out persons who are equally entitled to status as United States Army veterans to be the means by which the goal of saving money was to be achieved, failed to insure that the means were rationally related to the purposes of Veterans' benefits legislation.
In sum, the new evidence does not establish the constitutionality of § 107(a); nor does it raise a genuine dispute as to a material question of fact.
Since the Court has considered all the new evidence submitted,[21] the government *1005 cannot claim it has not been afforded an adequate opportunity to defend the constitutionality of § 107(a). It has been able, in the motion for reconsideration, to argue what interpretation should be given to the new evidence; Plaintiff has responded.[22] There is no reason, therefore, why the Court cannot dispose of the current motion by interpreting the new evidence without further briefing, just as it would had it been briefed as a motion for summary judgment.[23]

CONCLUSION:
The government was not prejudiced by the lack of formal notice of conversion and the sua sponte grant of summary judgment for plaintiff. It should be charged with notice that the Court would consider extrinsic evidence of the constitutionality of § 107(a) because such evidence was proffered by plaintiff at the outset and defendant also relied on such evidence. Similarly, since it knew that the constitutionality of the act was the sole, dispositive issue remaining in the case, it can hardly have been surprised that a finding of unconstitutionality would lead to summary judgment for plaintiff.
Because striking down statutes is a serious matter, however, the Court has given full consideration to the additional evidence. The additional evidence does not establish the constitutionality of the act, particularly with respect to the benefit at issue in this case, survivors' benefits. Nor does the new evidence give rise to a dispute over a material question of fact. It merely gives the Court additional material with which to ascertain the "concerns motivating Congress" and congressional intent; but interpretation of this material is a question of law. Because the government has had an opportunity to argue what interpretation should be given to this material, and plaintiff has responded, there is no need to order another round of briefing, which will only delay matters. And upon consideration of all the evidence and arguments presented in this matter, the Court adheres to its determination that § 107(a) is unconstitutional. Therefore the motion for reconsideration has been denied.
NOTES
[1] An Order denying the Motion was signed late Monday, July 10, 1989 and entered July 11. Because of time constraints  the government had to file its appeal by end of business July 11, 1989  the Court had not completed preparation of this Memorandum when it issued the Order. This Memorandum explains the Court's reasons for denying the Motion.
[2] At the time the motion to dismiss was briefed and decided, Beveridge & Diamond appeared as amicus curiae, because it had not received authorization from Plaintiff. It has since received authorization and entered an appearance on Plaintiff's behalf.
[3] E.g., Transcript of Hearing on Motion to Dismiss 4-5, 11-12 (March 16, 1989) (government counsel's references to U.S. Army Study); see id. at 23-24 (Amicus Curiae, now plaintiff's counsel, relying on facts established by U.S. Army Study).
[4] Although the grant of summary judgment was pursuant to the government's motion to dismiss, that does not negate the proposition that the Court treated the motion to dismiss as one for summary judgment. As noted above, the Government included exhibits in its Reply and referred to Plaintiff's exhibits in its Reply and at oral argument; had the Court found the statute constitutional based upon these exhibits, it still would have had to treat the motion to dismiss as one for summary judgment.

The overwhelming weight of authority provides that when one party moves for summary judgment, the Court can grant summary judgment to the non-moving party notwithstanding the absence of a cross-motion, if summary judgment is otherwise appropriate. That is, in effect, what the Court did; it denied Defendant's motion for summary judgment and granted summary judgment for plaintiff.
Procedurally, Rule 56 requires that the motion be filed not earlier than ten days prior to a hearing on the motion. This requirement was satisfied. Given the limited factual context in which the constitutionality of § 107(a) must be decided, the local rule requirement that the parties submit statements of material facts not disputed can be, and was, easily dispensed with. Thus the only "procedural" requirement at issue as far as the Court's treatment of the motion is concerned is whether Defendant had fair notice that summary judgment might be granted. This is functionally equivalent to the requirement that all parties be given a "reasonable opportunity to present" all pertinent material. If the government did not have such notice, it did not have a "reasonable opportunity" to present all pertinent material; if it had notice, then it had a "reasonable opportunity" to present all such material.
[5] To the extent there was another issue to litigate  damages  the Court did not grant judgment, but instead limited judgment to prospective relief; it left to Defendant, at least initially, to compute the amount of benefits plaintiff is entitled to on the basis of her application.

The Court did not retain jurisdiction of the complaint; it granted all the relief it deemed appropriate. Thus it is arguable that the Court's judgment was a final judgment subject to the ten (10) day time limit of Rule 59(e), which this Court has no jurisdiction to waive. Plaintiff has not argued that this Rule applies, and given the lack of clarity as to whether the judgment was final the Court declines to apply Rule 59(e). The Court is particularly hesitant to apply Rule 59(e) because the Court's ruling in Quiban controls, and was intended to control, many other Filipino complaints. No time barrier would be presented if the Defendant wanted to bring the additional evidence to the Court's attention in a case where judgment has not yet been entered (and application of collateral estoppel to bar presentation of such evidence would be ill-advised under the circumstances). And inconsistent determinations as to the constitutionality of § 107(a) would be intolerable. Under the circumstances the Court will not apply Rule 59(e).
[6] The relevant portions of Stissi state: "When a decision turns on the meaning of words in a statute or regulation, the decision is one of law which must be made by the court. The application of a statute's terms to undisputed facts also is a question of law." 765 F.2d at 374 (citations omitted).

In addition, the district court in USFL prefaced its evidentiary ruling with a similar statement: "As a threshold matter, the interpretation of legislation ordinarily is a question of law to be resolved by the court." USFL, 634 F.Supp. 1155, 1170 (S.D.N.Y.1986).
[7] The Court prefaced its discussion by categorizing the evidence which the USFL claimed was erroneously excluded into three categories: (1) the NFL's lobbying activities in connection with the 1961 Sports Broadcasting Act and the 1966 NFL-AFL merger legislation, (2) Congress' motives in enacting this legislation, and (3) Senator Alphonse D'Amato's knowledge of the NFL's use of "pressure" tactics in its congressional lobbying. 842 F.2d at 1373.
[8] As will be discussed in the text below, this establishes that the new materials will not raise an issue of fact precluding summary judgment. It will simply provide additional materials with which to ascertain congressional intent, a question of law.
[9] The Court does not mean to suggest that the Hearings are therefore not probative of legislative intent with respect to § 107(a). The Court has treated them as probative of such legislative intent.
[10] The government actually cited to it three times.
[11] It is not without significance that the government referred to the Study, in its Reply Memorandum, as the "definitive U.S. Army study." Defendant's Reply to Memorandum of Amicus Curiae 2. The high praise given to this Study evinces not only a recognition that the Court would be amply justified in considering it, but a desire to have the Court consider it.
[12] Transcript of Hearing on Motion to Dismiss 4-5 (setting forth factual background and noting all facts established by U.S. Army Study).
[13] Id. at 9.
[14] Id. at 12 ("To point out yet another distinction and this is also in the Military Study, the Philippine Army was designed as a different entity  as light infantry rather than heavy infantry"); see also id. at 11 (relying on nature of initial enlistment of six month duration, a fact set forth in U.S. Army Study; and in response to Court inquiry, relying on U.S. Army Study to argue that this type enlistment made Philippine Army Veterans more like National Guard as opposed to U.S. Army).
[15] See Motion for Reconsideration at 2 (citing McBride v. Merrell Dow & Pharmaceuticals, Inc., 800 F.2d 1208, 1212 (D.C.Cir.1986) (district court erroneously granted summary judgment on issue of actual malice when prior proceedings had focused on accuracy of statements; plaintiff had not been afforded any discovery on defendant's state of mind); TeleCommunications of Key West v. United States, 757 F.2d 1330, 1334 (D.C.Cir.1985) (improper to consider motion to dismiss as motion for summary judgment because argument heard mere 4 days after motion served, which is inconsistent with 10 day requirement of Rule 56 and reasonable period for response requirement of 12(b)); Stewart v. Credit Bureau, Inc., 734 F.2d 47 (D.C.Cir.1984) (district court erroneously granted summary judgment on issue different from that raised by defendant, denying plaintiff an opportunity to prove unreasonableness of defendant's procedures, even though defendant explicitly stated it did not base its motion on the reasonableness of its procedures)); Reply to Plaintiff's Opposition to Defendant's Motion for Reconsideration at 3 (citing Yashon v. Gregory, 737 F.2d 547, 553 (6th Cir.1984) (district court improperly granted summary judgment sua sponte where there was no motion from defendant, plaintiff clearly unsure whether summary judgment was contemplated as evidenced by his conditional motion for continuance under Rule 56(f); further, court should not have denied motion for continuance simultaneously with grant of summary judgment); Stewart, supra; Estate of Smith v. Tarrant County Hospital District, 691 F.2d 207, 209 (5th Cir.1982) (motion to dismiss briefed but not decided; discovery then commenced; twenty months later, with no further motion other than one to amend complaint, court granted motion to dismiss on basis of "pleadings and depositions"; court unwilling to assume plaintiffs had produced all of their ammunition)).

This case is not like any of the cited cases. The Court granted summary judgment on the only issue left, and the one defendant asked the court to decide, with knowledge that extrinsic materials would be considered. And the government obviously cannot state it needed discovery.
[16] Admittedly, the new evidence  internal executive memoranda  is technically not "legislative history" in the traditional sense. But they are offered, and are relevant, only to the extent they are probative of congressional intent. Thus they should be treated, if considered at all, as traditional legislative history materials. And whether they show the "concerns motivating" Congress or congressional intent depends on how they are interpreted. And as the government apparently recognizes, the interpretation of legislative history materials is a question of law for the court.
[17] Indeed, the dubious status of these materials as evidence of congressional intent casts doubt on the government's argument that it did not present all of its evidence because it was unaware that the Court might grant summary judgment for plaintiff. The most likely scenario is not that the government did not know it should come forward with all of its evidence on the constitutionality of § 107(a), but that it thought it had produced all of its evidence. Nevertheless, for the reasons stated in the text, the Court will consider the new materials as evidence of the statute's constitutionality.
[18] The government does not make this argument specifically; it cites, however, Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), which held that the administrative cost of individual determinations as to whether a marriage was bona fide or a sham to obtain benefits was sufficient to sustain the constitutionality of a statute that barred Social Security survivors' benefits to a spouse who had been married less than nine months at the time of decedent's death. Salfi and this case are clearly distinguishable.

First, as noted in the text, although a claimant has the burden of proof as to eligibility, here the government has ultimate responsibility and control over the most reliable evidence as to eligibility service records. In Salfi, only the claimant could have evidence as to the fact at issue  the bona fides of the marriage.
Second, the fact at issue here is purely objective  whether or not the person served in the Philippine Army  capable of relatively easy determination. In Salfi, the fact at issue was purely subjective. Nevertheless, notwithstanding the purely subjective nature of the inquiry, the Court specifically noted that where certain objective evidence as to the bona fides of the marriage existed the nine month limitation did not apply. Salfi, 422 U.S. at 780-81, 95 S.Ct. at 2474-75 (nine month limitation did not apply if the surviving spouse was the mother or father of the late spouse's child; if either the surviving spouse or the late spouse had adopted the other's child; if they legally adopted a child; all of which were viewed as objective evidence of the assumption of marital responsibilities).
Third, the legislative history of the statute at issue in Salfi clearly established that the limitation was for the purpose of protecting against the possibility of sham marriages. There is no evidence that Congress was concerned about sham claims of service, other than the subsequent executive memoranda noting the inadequate records. As explained in the text, this evidence is rebutted by Congress' actions  it awarded benefits in the areas most affected by the inadequate records.
[19] Quizon v. Veterans Administration, No. 87-2836, Defendant's Motion to Dismiss at Exhibit B (Declaration of Major Paul K. Casio in Badajos v. Veterans Administration, No. 85-1448, describing need for and formation of "recognized guerilla" rosters); see also 37 U.S.C. §§ 551-558.
[20] Second Supplemental Surplus Appropriation Rescission Bill, 1946: Hearings on H.R. 5604 Before the Subcommittee of the Senate Committee on Appropriations, 79th Cong., 2d Sess. 60 (1946) (quoting Statement by the President, February 20, 1946), reprinted in Amicus Curiae's SurReply Brief as Exhibit 1.
[21] The government's motion for reconsideration was arguably ambiguous as to whether it had additional evidence. See Defendant's Motion for Reconsideration at 15 ("[I]n light of the evidence we have proffered herewith, and any additional materials and arguments brought forth by plaintiff, amicus curiae, or defendant during the summary judgment proceedings ...") (emphasis added). Read in context, however, this appears to do nothing more than reserve the government's right to submit rebuttal evidence had plaintiff submitted evidence in opposition. Plaintiff did not submit any evidence in opposition. Therefore, and since the government is in control of all evidence of legislative intent, the Court deems its case fully submitted.
[22] Plaintiff has not suggested, and it would appear to be virtually impossible, that it can produce rebuttal factual evidence.
[23] For that matter, since its an issue of law subject to de novo review, the government will have another chance to brief the matter to the court of appeals, which it plainly intends to do.